IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 23-11937

_____

EARL M. JOHNSON JR., J.D.

Plaintiff - Appellant,

v.

LENNY CURRY, in his official capacity, *et al.,*

Defendants - Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

_____

**APPELLANT'S OPENING BRIEF**

_____

Respectfully submitted,

By:    */s/ Earl M. Johnson Jr.*
Earl M. Johnson, Jr.
*Pro Se* Appellant
1635 North Liberty Street
No. 3
Jacksonville, FL  32206
(904) 525-2479 Telephone
earlmayberryjohnson@gmail.com

Dated: December 12, 2023

## <u>APPELLANT'S CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

In compliance with Eleventh Circuit Rule 26.1-1 – 26.1-4, Appellant identifies all attorneys, persons, associations of persons, firms, partnerships, or corporations known by Appellant to have an interest in the outcome of this case:

U.S. Magistrate Judge Patricia Barksdale, deciding judge

Bennett, John, counsel for the State of Florida

Boeckman, Laura, counsel for the State of Florida

City of Jacksonville, Defendant-Appellee

Curry, Lenny, Defendant-Appellee (Former Mayor of Jacksonville, FL)

Deegan, Donna (Current Mayor of Jacksonville, FL)

DeSantis, Ronald, Defendant-Appellee (Current Governor of Florida)

District Court Judge Elizabeth Howard, deciding judge

Johnson Jr., J.D., Earl M., Plaintiff-Appellant

Office of Attorney General, State of Florida

Office of General Counsel, City of Jacksonville

Phillips, Jon, counsel for City of Jacksonville

Roberson, Helen, counsel for City of Jacksonville

i

Schreiber, Charles, counsel for the State of Florida

State of Florida, Defendant-Appellee

Respectfully submitted,

By:   */s/ Earl M. Johnson Jr.*
Earl M. Johnson, Jr.
*Pro Se* Appellant
1635 North Liberty Street
No. 3
Jacksonville, FL  32206
(904) 525-2479 Telephone
earlmayberryjohnson@gamil.com

Dated: December 12, 2023

## APPELLANT'S STATEMENT REGARDING ORAL ARGUMENT

Appellant, Earl M. Johnson Jr., J.D., (hereinafter "Appellant") respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(1) and Rule 28-1(c) of the Eleventh Circuit Rules. Appellant has raised timely and pressing issues of whether, as an African American experiencing fear, anger, and racial discrimination, federal rights are violated via Confederate tributes on State and City public land. The district court found no Article-III standing, however Appellant contends that concrete and particularized "stigmatic injuries"

are sufficiently pled; as well as taxpayer standing.

Appellant anticipates that Amicus Curae parties will also file briefs supporting Appellant's position on claims violations of Title II Public Accommodations, and the Thirteenth and Fourteenth Amendments. In view of the foregoing, the case is particularly suited for oral argument.

## TABLE OF CONTENTS

COVER...........................................................................................C

CERTIFICATE OF INTERESTED PERSONS....................................i

STATEMENT REGARDING ORAL ARGUMENT..............................ii

TABLE OF CONTENTS...................................................................ii

TABLE OF AUTHORITIES.............................................................vi

STATEMENT OF JURISDICTION....................................................x

STATEMENT OF THE ISSUES........................................................1

INTRODUCTION............................................................................2

STATEMENT OF THE CASE............................................................6

        A. Factual Background............................................6

        B. Procedural History............................................10

        C. Standards of Review..........................................11

SUMMARY OF ARGUMENT............................................................11

ARGUMENT..................................................................................14

  a. **The District Court Erred in Not Finding Article III Stigmatic Injury** ...................................................................................14

     1. Confederate Tributes Have Always Been Symbols of White Supremacy.............................................................................14

     2. Appellant Properly Pled Concrete, Particularized "Stigmatic Injury"..................................................................19

     3. "Stigmatic Injury" under Title II Public Accommodations........24

     4. "Stigmatic Injury" under Thirteenth Amendment Badges of Slavery...................................................................................29

     5. "Stigmatic Injury" under Fourteenth Amendment Equal Protection..............................................................................36

  b. **The District Court Erred in Not Finding Taxpayer Standing**..................................................................................37

  c. **Conclusion**...............................................................................38

## TABLE OF AUTHORITIES

### Cases

*Allen v. Wright*, 468 U.S. 728 (1984)..........................................................20, 23 n. 8

*Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019)....26

*Brewer v. Hoxie School District No. 46, etc.*, 238 F.2d 91 (8th Cir. 1956).............36

*Civil Rights Cases*, 109 U.S. 3 (1883)..................................................................29, 32

*Commonwealth of Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia*, 353 U.S. 230 (1957)..........................................................................36
*Crampton v. Zabriskie*, 101 U.S. 601 (1789)............................................................37

*Diamond v. Charles*, 476 U.S. 54, 106 S. Ct. 1697, 1706 (1986)...........................24

*Dredd Scott v. Stanford*, 60 U.S. 393 (1857)............................................................31

*Egerton v. City of St. Augustine*, No. 3:20-cv-941-BJD-PDB, D67 (adopted D72), decided March 20, 2023.............................................................................................37

*Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1407 (11th Cir. 1993)................................................................................................24, 27, 28, 34, 36

*Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476-9 (3d Cir. 2016)..........................................................................................26

*Heart of Atlanta Motel v. United States,* 379 U.S. 241, 250-53 (1964).................25

*Heckler v. Mathews*, 465 U.S. 728 (1984).....................................................20, 23, 27

*Hodges v. U.S.,* 203 U.S. 1 (1906).............................................................................30

*Gardner v. Mutz*, 857 F. App. 633, 635 (11th Cir. 2021).......................................21

*Gardner v. Mutz*, 962 F.3d 1329 (11th Cir. 2020)..................................................21

*Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)......................................33, 34, 36

*Ladies Memorial Association v. City of Pensacola*, No. 20-14003, 2022 WL 1536750 (11th Cir. May 16, 2022)..................................................................24 n.8

*Laufer v. Arpan LLC*, 29 F.4th 1268 (11th Cir. 2022), *mooted see Laufer v. Acheson Hotels LLC*, 50 F.4th 259, *vacated and remanded as moot, Acheson*, No. 22-429,

(U.S. Supreme Court, December 5, 2023)........................................................................19, 20, 22

*McMahon v. Fenves*, 946 F.3d 266 (5th Cir. 2020).............................................21

*Memphis v. Greene*, 451 U.S. 100, 125 (1981).......................................................34

*Murray v. City of Austin*, 947 F.2d 147 (5th Cir. 1991), *rehearing denied*, 1991 U.S. App. LEXIS 29558 (5th Cir.), *cert. denied*, 505 U.S. 1219 (1992)...............27

*Or. v. Mitchell*, 400 U.S. 112, 128-29 (1970).....................................................29, 30

*Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1280 (11th Cir. 2008).........................37, 38

*Plessy v. Ferguson*, 163 U.S. 537 (1896)...........................................................32, 33

*Robertson v. Johnson*, 376 F.2d 43 (5th Cir. 1967)....................................................28

*Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995), *cert. denied*, 517 U.S. 1201 (1996).............................................................................................................27

*Romer v. Evans*, 517 U.S. 620 (1996).....................................................................28

*Salazar v. Buono*, 559 U.S. 700 (2010)...................................................................27

*Shelley v. Kraemer*, 334 U.S. 1 (1948)....................................................................36

*Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021).................12, 19, 20, 22, 25, 27

*Sierra Club v. Morton*, 405 U.S. 727 (1972)..........................................................21

*Slaughter-House Cases*, 83 U.S. 36, 69, 71–72 (1873).......................................30, 34

*United States v. Baird,* 85 F.3d 450, 454-55 (9th Cir. 1996).........................17, 25, 34

*United States v. Guest*, 383 U.S. 745 (1965)..........................................................36

*United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016)............................11

*United States v. Cannon*, 750 F.3d 492, 501 (5th Cir. 2014).......................30, 34, 35

*United States v. Stanley*, 109 U.S. 20 (1883)............................................................34

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464, 485 (1982).........................................................................................23

## Federal Statutes

Civil Rights Act of 1866........................................................................................29

28 U.S.C. § 2201 (a)..............................................................................

42 U.S.C. §1982.....................................................................................33

42 U.S.C. §1983.....................................................................................34

28 U.S.C. § 1331...................................................................................... x

28 U.S.C. §1291....................................................................................... x

28 U.S.C. §1294(1).....................................................................................x

28 U.S.C. §2253(a)......................................................................................x

42 U.S.C. § 2000a (a)................................................ iii, iv, 5, 10,13, 18, 28 n.8, 29

42 U.S.C. § 12101....................................................................................22

## 11th Circuit Rules

26.1-1........................................................................................................ i

26.1-4.........................................................................................................i

## Federal Rules of Appellate Practice

34(a)(1)..................................................................................ii

28-1(c)..................................................................................ii

27(d)(2)(A)............................................................................39

32(f)......................................................................................39

32(a)(5)..................................................................................39

32(a)(6)..................................................................................39

## U.S. Constitution

Article III ................................................ ii, iv, v, 5, 10, 11, 12, 37, 38

Thirteenth Amendment ............................iii, iv, v, 5, 10, 18, 29, 33, 34

Fourteenth Amendment ................................. iii, iv, v, 5, 10, 18, 36, 37

## Other Authorities

Britt, Wager, Steelman, *Du Bois Review: Social Science Research on Race*, Volume 17, Issue 1, Spring 2020.............................................................................16

Karen Cox, *Dixie's Daughters: The United Daughters of the Confederacy and the Preservation of Confederate Culture*, University of North Carolina at Charlotte, May 11, 2003...................................................................................................16

Laurie Goodstein, *Swastika is Deemed Universal Hate Symbol,* N.Y. Times, July 28, 2010, tinyurl.com/ylrt34kh ......................................................... 3, n.1


Jane Dailey, University of Chicago, professor of American history; *Confederate*

viii

*Monuments Were Never Really About Preserving History,* Ryan Best, July 8, 2020, projects.fivethirtyeight.com (December 8, 2023; 6:37 p.m.)...............................16

*Whose Heritage* | Southern Poverty Law Center (splcenter.org)(November 17, 2021)...................................................................................................................17

Kyshia Henderson, *Confederate Monuments and the History of Lynching in the American South: An empirical Examination,* October 11, 2021...........................18

Scott Holmes (2019) *Do Public Confederate Monuments Constitute Racist Government Speech Violating the Equal Protection Clause?,* North Carolina Central Law Review: Vol. 41 : No. 2 , Article 2.........................................................15

Edward H. Kyle, *Symbolism and the Thirteenth Amendment: The Injury of Exposure to Governmentally Endorsed Symbols of Racial Exposure to Governmentally Endorsed Symbols of Racial Superiority,* 25 Mich. J. Race & L. 77 (019)......................................................................................................................30

Jennifer Mason McAward, *Defining The Badges, supra* 14 U. Pa. J. Const. L. 561 (2011-2012), n. 3, at 576–78...............................................................................32

Oxfordlearnersdictionaries.com (December 8, 2023; 5:44 p.m.)...........................9

merriam-webster.com. (December 8, 2023; 5:48 p.m.)..........................................9

George Rutherglen, *The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment,* University of Virgina School of Law (2007)...........................................................................................................31, 32

Nicholas Serafin, *Redefining the Badges of Slavery,* 56 U. Rich. L. Rev. 1291, 1337 (022)......................................................................................................................33

Richard Schragger, *Confederate Monuments and Punitive Preemption: The Latest Assault on Local Democracy,* University of Virginia School of Law Public Law and Legal Theory Research Paper Series, 2019-54 October 2019...............................15

Nina Silber, *Worshipping the Confederacy is about white supremacy – even the*

*Nazis thought so*, The Washington Post, August 17, 2017 ............................ 3, n.1

James Q. Whitman, *Hitler's American Model: The United States and the Making of Nazi Race Law* (Princeton). ............................................................................ 3, n.1

*Thirteenth Amendment*, 21 Harv. C.R.-C.L. L. Rev. 689, 735-36 (1986) ..............35

A.Tsesis, *Confederate Monuments as Badges of Slavery*, Kentucky Law Journal, Vol. 108, No. 4, 2020 ..................................................................................35 n.10

A.Tsesis, *Confederate Monuments as Badges of Slavery*, Loyola University Chicago, School of Law (2020) ......................................................................................................................35

## STATEMENT OF JURISDICTION

Appellant sought a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. Section 2201 (a), in the Middle District of Florida under 28 U.S.C. § 1331, because the claims arise under the Constitution and laws of the United States. The district court adopted the magistrate judge's report and recommendation and dismissed the Second Amended Complaint. On June 6, 2023, Appellant filed a timely notice of appeal. Jurisdiction in this Court is proper under 28 U.S.C. §§ 1291, 1294(1), and 2253(a).

## STATEMENT OF THE ISSUES

1. Whether Appellant sufficiently pled an Article-III "stigmatic injury" alleging race discrimination and being struck with "deep repulsion, disheartenment, and intimidation" when confronted with tributes to Confederates and the Confederacy in governmentally owned public spaces, in violation of the Civil Rights Act of 1964 (Title II Public Accommodations), in violation of the Thirteenth Amendment badges of slavery prohibitions, and in violation of Fourteenth Amendment equal protection, where Appellant is an African American descendant of enslaved African Americans held in the Confederacy, the Confederacy was founded on White supremacy over African Americans and the maintenance of the slavery of African Americans, and Confederate tributes continue to be a rallying call for the ideals of White supremacy against Appellant and violence against African Americans in Appellant's community?

2. Whether Appellant sufficiently pled taxpayer standing alleging to be  a taxpayer and claiming that budgetary expenditures inuring to the benefit and presence of tributes to Confederates and the Confederacy in City owned public spaces to be unconstitutional expenditure where the Confederacy was founded on White supremacy over African Americans

and the maintenance of the slavery of African Americans, and Confederate tributes continue to be a rallying call for the ideals of White supremacy against Appellant and violence against African Americans in Appellant's community?

3. **INTRODUCTION**

Imagine being Jewish and the fastest route to work was via Hitler Avenue or having to drive to a county named after another Nazi. In real-world parallel from that upside-down fictional universe, for Appellant such is the landscape of local and state public spaces marred by tributes to a preceding group of White supremacists: Confederates and the Confederacy.

Gone with the wind are the days where reasonable could people debate whether the Confederacy was founded on the principal of White supremacy over African Americans (Black people). In this declaratory action, Appellant argues that tributes to the Confederacy in public places owned by the City and State, benefiting from public dollars, are tantamount to a governmental endorsement of White supremacy over Appellant who is Black. [D63, pp.2-9].

In the face of these tributes, Appellant pleads to be struck with "deep repulsion, disheartenment, and intimidation." [D63, pp.2-9]. In other words, Appellant alleges serious antagonism, emasculation, and fear when confronted

with public spaces honoring Confederates and the Confederacy. The district court however considered Appellant's pleas to be of no moment.

For Appellant, these public, tax-paid homages to disgraced, treasonous racists and their separatist government are the remainder of public "Whites Only" segregation and other racially discriminatory Jim Crow policies, customs, and laws made to enforce the "badges" of slavocracy long after the Thirteenth Amendment was ratified.

Appellant also alleges violence and incitement of White supremacists against Black people at the locales of these tributes, claiming past acts of violence and intimidation in support of the reasonableness of his "stigmatic injury" claims (studies show where public tributes to the Confederacy or Confederates exist, violence against Black Americans by White supremacists is intensified).[1]

Appellant alleges that "Alexander Stephens, the Vice President of the Confederacy, underscored the White supremacy bedrock of the secessionist

---

[1] Appellant's county of residence is the location of the recent racially-fueled massacre, in August of 2023, of three (3) Black people by a White supremacist Importantly, Jacksonville, Florida is also the location of a least 10 public tributes to the Confederacy and Confederates (even after approximately 12 such public tributes in the City have been removed over recent years). Also notable, the killer drove from a neighboring county to commit the murders in Duval and displayed a swastika. Beyond anti-Semitism, the swastika has evolved into a general symbol of hate and White supremacy used to terrorize and intimidate numerous ethnic and racial minorities. *See* Laurie Goodstein, *Swastika is Deemed Universal Hate Symbol*, N.Y. Times, July 28, 2010, tinyurl.com/ylrt34kh (recognizing the swastika is a symbol "used as an epithet against African Americans ... as well as Jews."). The origins of the deep connection between the Confederacy and Nazism starts with Hitler. James Q. Whitman, *Hitler's American Model: The United States and the Making of Nazi Race Law* (Princeton). There, Whitman identifies that in "Mein Kampf," Hitler praises America as one state that has made progress on primary racial citizenship by excluding certain races. "[Hitler] believed a Confederate victory would have set the country on a proper course. "'The beginnings of a great social order based on the principle of slavery and inequality,'" he explained in 1933 to a fellow Nazi leader, "'were destroyed'" when the South lost the Civil War." Nina Silber, *Worshipping the Confederacy is about white supremacy – even the Nazis thought so*, The Washington Post, August 17, 2017.

3

government in his *Cornerstone Speech*: "'Our new government is founded upon the great truth that the Negro is not equal to the White man … '" [D63, pp.2-9], quoting Alexander Stephens, V.P., C.S.A.

Likewise, Appellant alleges that the "designer of the Confederate Battle Flag, William Thompson, gave it the moniker 'the White man's flag.'" [D63]. Appellant adds that tributes to the Confederacy, Confederates, and White supremacists support "the ideology that Plaintiff, a Black American, is inferior and subhuman, violating Plaintiff's [federal] rights …" [D63, pp.2-9].

Appellant lists over 40 Confederate tributes on public land within the City and Middle District of Florida, ranging from monuments to naming tributes in public spaces such as parks, roads, buildings, and counties. [D63, pp.2-9].

More specifically, Appellant alleges to have recently traveled to most of those locations and, given their tributes' meaning and that "the KKK, Nazis and other race hate groups have and continue to use Confederate tribute sites within the Middle District of Florida to celebrate White supremacy ideals, and continue to encourage the incitement of intimidation and violence against Black Americans, of which Plaintiff is one," in the face of these tributes, Appellant pleads to be struck with "deep repulsion, disheartenment, and intimidation." [D63, pp. 2-9].

In other words, Appellant alleges "stigmatic injury": pleading serious antagonism, emasculation, and fear when confronted with public spaces honoring Confederates and the Confederacy and violations of Title II, the 13th Amendment, and 14th Amendment, and equal protection among other claims.

This appeal stems from the district court's finding that Appellant lacked any Article-III injury, and thus standing, to redress his claims that, as an African American (and a Black descendant of Africans enslaved in Confederate states), tax-funding benefiting Confederate tributes on public land violates his federal rights to be free of racial discrimination at the hands of the government. Overlooking this Court's use of Article-III-qualifying "stigmatic injury" status, the district court erred in holding Appellant's claims of intimidation and exclusion in the face of Confederate tributes on public land, based upon his race, to be "abstract" and "conclusory."

Likewise the district erred in finding no taxpayer standing for Appellant's federal claims.

Based upon the foregoing, this Court should reverse the judgment of dismissal, finding Article-III "stigmatic injury" standing and taxpayer standing and remand the case for further proceedings.

## STATEMENT OF THE CASE

### 1. Factual Background

In 2021, Appellant[2] brought a *pro se* declaratory action against the State of Florida (hereinafter "State" or "Defendant") and the City of Jacksonville (hereinafter "City" or "Defendant"), asking the district court to declare that the use of state and local tax dollars benefiting the presence of Confederate tributes on public lands violates Appellant's rights under federal law and the United States Constitution, claiming race discrimination and intangible or "stigmatic injury." [D63, pp.2-9].

In the declaratory action, Appellant alleges that the Confederate States of America (hereinafter "Confederacy" or "Confederate") was founded 1860, in treason, included 11 southern states seceding from the United States of America, and caused the Civil War to preserve the enslavement of African Americans (Black people). [D63, pp. 2-3].

Appellant contends that weeks before the start of the Civil War, Alexander Stephens, the Vice President of the Confederacy, proclaimed the

---

[2] Appellant is an urban middle school Civics teacher who holds a Juris Doctorate. Appellant is an African (Black) American resident of Jacksonville, Florida, and the son of Florida Civil Rights Hall of Fame late attorney Earl M. Johnson, who desegregated Florida schools, successfully litigated *Ida Phillips v. Martin Marietta* (landmark Title VII and Supreme Court case) before this Court (former 5th Circuit) and was an attorney of Rev. Dr. Martin Luther King Jr. and the Honorable Andrew Young.

Confederate ideal of perpetual inferiority of Black people to their White countrymen in the *Cornerstone* speech:

> Our new government is founded upon the great truth that the Negro is not equal to the White man; that slavery, subordination to the superior race, is his natural and normal condition.

> Alexander Stephens, V.P., C.S.A. [D63, p.3].

Appellant charges there is no question about the White supremacist ideology of the Confederacy, alleging the designer of the Confederate Battle Flag, William Thompson, called it the "the White man's flag." [D63, pp.2-9].

Appellant further alleges that following the defeat of the Confederacy in the Civil War, and during Reconstruction that followed, White supremacy organizations emerged such as the Ku Klux Klan ("KKK"), Knights of the White Camellias, and White League, seeking to preserve White supremacy through murder, violence, and intimidation within the Middle District of Florida. [D63, pp.2-9].

According to Appellant's declaratory action, by 1912 White supremacist women's auxiliary groups such as the United Daughters of the Confederacy ("UDC"), within the Middle District of Florida, rose to promote the falsehood of benign ownership of Black Americans and White supremacy; working with the KKK to "protect whites from negro rule." [D63, pp.2-9].

7

Further, within the Middle District of Florida, Appellant alleged the existence of over 40 monuments and naming tributes to the Confederacy and Confederates on tax-funded public land, including but not limited to counties, a county census district, school district names, parks, schools, streets, roads, programs, and a courthouse KKK mural, among other tributes.[3]

---

[3] **Baker**
- Baker County
- Baker County School District
- Baker County Pre-K/Kindergarten
- Baker County Middle School
- Baker County High School
- Robert E. Lee Lane
- Baker County Courthouse Mural Depicting Hooded KKK Members Riding Horseback

**Bradford**
- Bradford County
- Bradford County School District
- Bradford County Middle School
- Bradford County High School

**Columbia**
- Olustee Confederate Battle Monument at State Park

**Duval**
- Florida Confederate Soldiers Memorial Pedestal at City Park
- Monument to Women of the Confederacy at City Park
- Yellow Bluff Fort Monument at State Park
- Confederate Point Road
- Confederate Street
- Confederate Point Road
- Stonewall (Jackson) Street
- (Stonewall) Jackson Street
- (Jefferson) Davis Street
- Jefferson (Davis) Street

**Hamilton**
- Confederate Monument at County Courthouse Lawn

**Hendry**
- Hendry County
- Hendry County School District

**Hernando**
- Confederate Soldier Monument at County Courthouse Lawn

**Hillsborough**
- Lanier Elementary School
- Robert E. Lee Road
- Stonewall Jackson Elementary School

**Lee**
- Lee County
- Lee County School District
- Lee County Adolescent Mothers Program
- Lee County Memorial Hospital

**Madison**
- Confederate Monument at State Park

**Manatee**
- Judah P. Benjamin Confederate Memorial at State Park

**Marion**
- Confederate Flag at County Government Building

8

Appellant alleges, over the preceding four (4) years before filing the declaratory action, to have traveled through or visited most all of the public locations identified within the Middle District of Florida. Appellant complains to be "deeply repulsed, disheartened, and intimidated by the governmental celebrations of White supremacy against him as a Black American."[4] [D63, pp.2-9].

Appellant complains that being deeply frightened, emasculated, and racially excluded in the face of Confederate tributes is "reasonable given that White supremacist organizations, such the KKK, Nazis and other race hate groups have and continue to use Confederate tribute sites within the Middle District of Florida to celebrate White supremacy ideals, and to encourage the incitement of intimidation and violence against Black Americans, of which Plaintiff is one." [D63, pp.2-9].

---

**Nassau**
- Yulee County Census Division
- General Lee Road

**Pasco**
- Pasco County
- Pasco County School District
- Pasco County Elementary School
- Pasco County High School

**Putnam**
- Robert E. Lee Drive
- Confederate Monument at County Courthouse Lawn

**Suwannee**
- Confederate Monument at State Park

**Volusia**
- Confederate Oak at City Park

[4] The Oxford Dictionary defines "intimidate" as to "frighten or threaten someone so that they will do what you want." Oxfordlearnersdictionaries.com (December 8, 2023; 5:44 p.m.). Webster Dictionary indicates the word means "to make timid or fearful: FRIGHTEN ... *especially*: to compel or deter by or as if by threats." merriam-webster.com. (December 8, 2023; 5:48 p.m.)(emphasis supplied).

Appellant further claims that tributes to the Confederacy, Confederates, and White supremacists, located on local public land support "the ideology that Plaintiff, a Black American, is inferior and subhuman, violating Plaintiff's [federal] rights ..." [D63, pp.2-9].

Appellant urges that the intentional conduct of the State and City is continuing in nature: "Defendants, in their official capacities, continue enact general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments and/or naming tributes to the Confederacy, Confederates and White supremacists on public land, within the Middle District of Florida, through public tax-based funding, under the color of law. Defendants' conduct is continuing in nature." [D63, p.9].

To this end, Appellant brought declaratory claims under Title II (Public Accommodations) of the Civil Rights Act of 1964, the Thirteenth Amendment, and the 14th Amendment. Appellant also claimed taxpayer standing. The district court dismissed the action in whole, finding that Appellant lacked an Article-III injury. [D63, pp.2-9].

### 2. Procedural History

a. Second Amended Complaint for Declaratory Judgment................[D63]
b. The magistrate judge's report and recommendation on Motions to dismiss the Second Amended Complaint......................................[D80]
c. Appellant's objections to the report and recommendation...........[D81]

d. The district court's overruling of Appellant's objections, and adoption and approval of the magistrate judge's report and recommendation..............................................................[D83]

e. Notice of Appeal..............................................................[D85]

## Standard of Review

The standard of review is *de novo. United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) ("[t]he district court's [12(b)(1)] subject matter jurisdiction is a question of law that we review *de novo*.").

## SUMMARY OF ARGUMENT

The district court missed the mark when it found Appellant, a local and state tax paying African American descendant of enslaved African Americans held in Confederate states, could articulate no concrete, particularized "stigmatic injury" for Article III standing under federal claims based upon Confederate tributes on State and City land within the Middle District of Florida, even though the district court did not challenge the White supremacy symbolism of Confederacy tributes.

Hinting the issue of tax-funded Confederate tributes on public land to be a nonjusticiable political question as argued by the Appellees [D80, p.17], the district court erred when it found Appellant's pleas of fear and intimidation to be "abstract" and "conclusory," indirectly defining "stigmatic injury" to be *per se*

insufficient, or at least generally too weak, to establish Article-III "stigmatic injury" standing - dismissing all counts. [D80, pp.26-27, 58-59]

On the other hand, as recently as in *Sierra* this Court continues to iterate that "stigmatic injury" is a qualifying injury for Article-III standing. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021) calms any question about the viability of a stigmatic injury claim in the 11th Circuit. Consistent with the protestations in *Sierra*, here Appellant complains to have suffered illegal discrimination and that the conduct resulted in "perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' ..." *Id*. The Court held that being made to feel subhuman and excluded in public spaces can be an Article-III violation. *Id*.

Below the district court gave short shrift to Appellant's intangible injury claims of intimidation, repulsion, and racial exclusion induced by Confederate tributes in public places, finding the allegations "a sort of abstract stigmatic injury," "generalized grievance," "conclusory" and "at a minimum, Mr. Johnson fails to allege facts showing he has suffered or will suffer a personalized injury required for ordinary standing." [D80, pp.26-27, 34]. The district court concluded that Appellant lacked Article-III concrete or particularized injury – without an actual analysis of Appellant's claims under a "stigmatic injury" considerations under appropriate 11th Circuit precedent. [D80, pp.17-27].

This error requires reversal and remand on all counts.

Among other things discussed *infra*, the district court erred by not applying the "full and equal enjoyment" language in Title II of Civil Rights Act of 1964's Public Accommodations law when factoring Appellant's claimed Article-III standing in considering "stigmatic injury."

Title II of the Civil Rights Act of 1964 (Public Accommodations) provides in pertinent part that "All persons shall be entitled to the **full and equal enjoyment** of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a (a) (emphasis added).

As "stigmatic injury" demonstrates, Appellant is not afforded full and equal enjoyment of public places marred by looming tributes to the ideal of White supremacy. This is so because Appellant's claims of fear, repulsion, and racial exclusion induced by government-supported Confederate tributes, i.e., the government-endorsed ideology of White supremacy.

The very essence of the Title II claim is that Appellant suffered "stigmatic injury" with Confederate tributes on public land, thereby impairing "full use and enjoyment" of the public accommodations. [D63, pp. 2-11]. In view of the foregoing, Appellant has stated a "stigmatic injury" under Title II.

13

Appellant has also sufficiently pled a concrete, particularized "stigmatic injury" under the Thirteenth Amendment and Fourteenth Amendment by virtue of the White supremacy messaging from Confederate tributes in public places and the "stigmatic injury" suffered thereby.

Finally, though unnecessary to prosecute the foregoing civil rights claims, Appellant has also properly pled taxpayer standing related to the allegation that budgetary expenditures by Appellees benefiting Confederate tributes are unconstitutional.

## ARGUMENT

### a. The District Court Erred in Not Finding Article-III Standing

1. Confederate Tributes Have Always Been Symbols of White Supremacy

Confederate tributes on public land have always been symbols of White supremacy over Black people:

> Although some of these Confederate memorials were
> dedicated shortly after the Civil War ended in 1865,
> the majority were dedicated during ... two spikes in
> Confederate memorialization coincide with the rise
> of Jim Crow laws and re-segregation efforts following
> the end of Reconstruction in the early 20th century,
> and with the massive-resistance campaign waged by
> opponents of the civil rights and desegregation movements
> of the 1950s and 1960s. These were not random
> acts of memorialization during a period of historical and
> patriotic fervor, but were instead part of a concerted
> effort to reinforce a white supremacist worldview in
> mainstream society.

14

Richard Schragger, *Confederate Monuments and Punitive Preemption: The Latest Assault on Local Democracy,* University of Virginia School of Law Public Law and Legal Theory Research Paper Series, 2019-54 October 2019 *citing* Am. Historical Ass'n, Statement on Confederate Monuments (2017), https://perma.cc/8Q6E-HKBH (arguing that Confederate monuments erected in the early and mid-20th century were "part and parcel of the initiation of legally mandated segregation and widespread disenfranchisement across the South . . . . [and] were intended, in part, to obscure the terrorism required to overthrow Reconstruction, and to intimidate African Americans politically and isolate them from the mainstream of public life").

"Confederate Monuments, built to advance the mythology of a 'Lost Cause' explanation for the Civil War and to advance white supremacy, constitutes the kind of Government speech that should be restricted by the Equal Protection Clause." Scott Holmes, *Do Public Confederate Monuments Constitute Racist Government Speech Violating the Equal Protection Clause?,* North Carolina Central Law Review: Vol. 41 : No. 2 , Article 2 (2019).

Further, research shows a direct link between Confederate tributes and racism against Black people. In addition to placing monuments and naming

honors, UDC's work was to prepare future generations of White Americans to respect and defend the principles of White supremacy - rejecting school textbooks that that said slavery was a central cause of the Civil War, praising the KKK (who helped build Confederate memorials), giving speeches that distorted the cruelty of American slavery, and defending slave owners. Karen Cox, *Dixie's Daughters: The United Daughters of the Confederacy and the Preservation of Confederate Culture*, University of North Carolina at Charlotte, May 11, 2003. "[T]hose were very clearly white supremacist monuments and are designed to intimidate, not just memorialize," increasing during notable periods of Black civil rights advancements. Jane Dailey, University of Chicago, professor of American history; *Confederate Monuments Were Never Really About Preserving History,* Ryan Best, July 8, 2020, projects.fivethirtyeight.com (December 8, 2023; 6:37 p.m.).

Notably, the deep, injurious nature of public tributes to the Confederacy alleged by Appellant may be more challenging for non-Blacks to grasp: "White U.S. residents are drastically less likely to perceive them as symbolic of racial injustice than are Black U.S. residents. Further, state protection of Confederate monuments leads to a diminished sense of belonging among Blacks, while leaving Whites unaffected." Britt, Wager, Steelman, *Du Bois Review: Social Science Research on Race*, Volume 17, Issue 1, Spring 2020 , pp. 105 – 123.

16

Confederate tributes on public land have been deemed badges of slavery and race discrimination in public places as they: "established public 'badges of inferiority' for the excluded group, marking them as of lower social status." *United States v. Baird,* 85 F.3d 450, 454-55 (9th Cir. 1996).

In the district court, Appellant presented allegations under oath that "More than 2,000 memorials in the United States valorize the Confederacy, a secessionist government that waged war to preserve white supremacy and the enslavement of millions of people. Erected as part of an organized propaganda campaign to terrorize African American communities, these memorials distort the past by promoting the Lost Cause narrative." *Whose Heritage* | Southern Poverty Law Center (splcenter.org), as of November 17, 2021. [D79, pp.9-10].[5]

Weighing on "stigmatic injury," where tributes to the Confederacy exist, violence against Black people at the hands of White supremacists intensifies. As a 2021 University of Virginia study shows: "Lynchings were a common tactic to suppress civil rights efforts and terrorize Black communities … [s]outhern White people lynched Black people (and other White people they perceived to support Black suffrage) in extremely violent ways, including mutilation,

---

[5] 12 (b)(1) "[f]actual attacks, on the other hand, challenge the existence of subject-matter jurisdiction in fact, and the district court may consider matters outside of the pleadings." *Koury v. Sec'y, Dep't of Army,* 488 F. App'x 355, 356 (11th Cir. 2012). When considering a 12 (b)(1) factual attack, Fed. R. Civ. P. 12(b)(6) standards apply. *Michel v. NYP Holdings, Inc.,* 816 F.3d 686, 694 (11th Cir. 2016).

dismemberment, and burning ... some of this torturing happened groups of people and in public spaces, often intentionally in predominantly Black areas ... the direct murderers participated in the terrorizing of Black Americans." Kyshia Henderson, *Confederate Monuments and the History of Lynching in the American South: An empirical Examination*, October 11, 2021. Using empirical data over decades, researchers found a direct correlation between lynchings and public Confederate tributes. At a minimum, the data below suggests that localities with attitudes and intentions that led to lynchings also had attitudes and intentions associated with the construction of public Confederate memorials. *Id.* The study diagram below shows dozens of lynchings and Confederate tributes cutting a swarth through the Middle District of Florida, highlighted in the darkest red.



Confederate Symbols and Victims of Lynchings in the Former Confederate States

- University of Virgina, *Confederate Monuments and the History of Lynching* (2021)

The White supremacy messaging of Confederate tributes on public land sets the groundwork of Appellant's concrete, particularized "stigmatic injury."

2. Appellant Properly Pled Concrete, Particularized "Stigmatic Injury"

The District Court erred in not finding concrete, particularized "stigmatic injury," deeming Appellant's underpinning allegations to be "abstract" and "conclusory." [D80, pp.24-27].

At the outset, this Court continues to iterate that "stigmatic injury" is a qualifying injury for Article-III standing. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110 (11th Cir. 2021); *Laufer v. Arpan LLC*, 29 F.4th 1268 (11th Cir. 2022)[6], *mooted, alive.").2022) , vacated on other grounds*, 77 F.4th 1366 (11th Cir. Aug. 15, 2023)(mem.).[7]

In *Laufer*, an ADA plaintiff claimed stigmatic injuries when viewing a hotel's website that omitted accessibility-related information required by federal regulation. Holding that the plaintiff need not have been physically present to suffer "concrete" emotional injury of frustration and embarrassment from viewing the site online, this Court found that the plaintiff met the requirements of a stigmatic injury, and that the injury was sufficiently particularized "because her emotional injury is *her* emotional injury." *Id.*, at

---

[6] Laufer was recently vacated on mootness grounds after counsel for Arpan LLC disclosed fifteen months after the opinion was issued that the company had dissolved seven weeks before the opinion issued. *Laufer v. Arpan LLC*, 77 F.4th 1366 (11th Cir. Aug. 15, 2023) (mem.). This disclosure was part of an apparent effort to avoid Supreme Court review in a related case. Id. at 1366 n.1. While Laufer is no longer binding on this Court, its analysis of Supreme Court and Eleventh Circuit stigmatic injury caselaw remains highly persuasive.

[7] Though recently mooted, *Laufer's* reasoning follows *Sierra* which reconfirmed "stigmatic injury" claims in the 11th Circuit based upon alleged violations of federal rights. Consistent with *Laufer*, Appellant complains that to have suffered illegal discrimination and that the conduct resulted in intimidation, being made to feel subhuman, and excluded in public spaces. *Id.*, 29 F.4th at 1272 (humiliation, frustration, embarrassment are ""a concrete intangible injury ... a particularized injury' ... we think that the emotional injury that results from illegal discrimination is [a concrete injury]").

1272 (emphasis supplied), *citing Sierra*, 996 F.3d 1110 (11th Cir. 2021); *Heckler v.* Mathews, 465 U.S. 728 (1984); *Allen v. Wright*, 468 U.S. 728 (1984).

Although *Laufer* is no longer binding on this Court, the cases *Laufer* relied upon remain binding and require the same result. In *Sierra*, the Eleventh Circuit similarly held that "that a deaf plaintiff suffered a concrete 'stigmatic' injury when he watched, but could not hear and thus understand, videos that a city posted on its official website and for which it re-fused to provide closed captioning." *Laufer*, 29 F.4th at 1273 (*citing Sierra*, 996 F.3d at 1114). The *Sierra* court reasoned that "[a]n individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination" because "[d]iscrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' ... can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Sierra*, 996 F.3d at 1114 (quoting *Heckler*, 465 U.S. at 739–40). Similarly, the repulsion and intimidation Appellant personally suffered when he viewed or traveled into the "the governmental celebrations of White supremacy against him as a Black American" caused him serious non-economic injuries from being marked as "innately inferior" compared to White citizens. [D63, pp.2-9].

The district court's reliance on *Gardner v. Mutz*, 962 F.3d 1329 (11th Cir. 2020) and *McMahon v. Fenves*, 946 F.3d 266 (5th Cir. 2020) to find that the Appellant lacked standing is both ironic and incorrect. These cases concerned the standing of Confederate sympathizers suing to prevent the removal of Confederate memorials from public property. *Id.* They turned on whether the Confederate sympathizers sufficiently established "aesthetic" injury under *Sierra Club v. Morton*, 405 U.S. 727 (1972) by alleging routine visits to Confederate memorials. *Gardner*, 962 F.3d at 1342–43 (holding that Confederate sympathizers failed to establish aesthetic injury by not alleging that they "routinely visited the [Confederate] monument in Munn Park"); *Gardner v. Mutz*, 857 F. App. 633, 635 (11th Cir. 2021) (holding that the same Confederate sympathizers sufficiently pled aesthetic injury on remand when they amended their complaint to allege "that they visit the [Confederate] monument regularly and have concrete plans to visit the monument again in the future"). The district court found that Appellant lacked standing because he did not allege routine visits to Confederate memorials. [D80, p.26 ("Unlike the plaintiffs in *Gardner* on remand, he fails to allege that he regularly visits any place or plans to regularly visit any place soon.")]. But the "aesthetic" injuries claimed by the Confederate sympathizers in *Gardner* are the exact opposite of the stigmatic injuries at bar.

21

Appellant's standing turns on the repulsion, intimidation, and race discrimination experienced from being exposed to dozens of governmentally sanctioned Confederate tributes. By contrast, the *Gardner* plaintiff's standing turned on the loss of their ability to enjoy regular visits to Confederate monuments celebrating White supremacy following their removal. Appellant does not need to allege routine visits to Confederate tributes to establish standing because he does not seek to enjoy them—instead, his injury arises from the repulsion, intimidation, and race discrimination he experiences from the occasions on which he has viewed and traveled into them.

Indeed, multiple visits are generally not required in stigmatic injury cases. For example, the deaf plaintiff in *Sierra* suffered a concrete stigmatic injury after visiting the defendant city's website only once. *Sierra*, 996 F.3d at 1111–12. Similarly, *Laufer* suffered a concrete stigmatic injury after visiting the website of an allegedly non-ADA compliant hotel only once, and despite "admit[ing] that she has no intention to visit the Value Inn or the area in which it's located." *Laufer*, 219 F.4th at 1271. The district court's conclusion that a plaintiff deeply repulsed and intimidated by Confederate monuments must plan to routinely visit them before suffering a cognizable injury misstates the standing requirements announced by stigmatic injury precedent. Moreover, this conclusion—which incoherently mixes the distinct bodies of caselaw

governing aesthetic and stigmatic injuries—is absurd on its face, as it suggests that only those who regularly enjoy Confederate memorials could possibly suffer an injury by their presence or lack thereof.

Nor is Appellant's injury a mere "psychological consequence presumably produced by observation of conduct with which [he] disagrees." *Cf. Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). Rather, as the Supreme Court explained in *Heckler* and this Court reaffirmed in *Sierra* and *Laufer*, "discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are denied equal treatment solely because of their membership in a disfavored group." *Heckler*, 465 U.S. at 729. These cases, read together, reveal that the stigma created by discrimination is not merely a psychological consequence— rather, it is a "serious" injury inflicted upon those whom society designates as "innately inferior."[8]

---

[8] "An individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination." *Id., citing Allen*, 468 U.S. at 757, n.22. Below, Appellant alleged the personal experience of having traveled to most of the public parks, monuments, memorials, roads, streets, counties and observed other governmental tributes to Confederates or the Confederacy named in the declaration action. These allegations went to all counts.

Appellant also complained of the emotional trauma experienced by the inundation of government endorsed White supremacy against Appellant as a Black person; that he would become nauseated, lose hope, and struck with fear – described as:

> During the last four (4) years, Plaintiff has traveled through or visited most all of the public locations above-identified within the Middle District of Florida.

Shown below, the "stigmatic injuries" complained of by Appellant in the declaratory action fit under Title II Public Accommodations, Thirteenth Amendment "badges of slavery," and Fourteenth Amendment equal protection. *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1407 (11th Cir. 1993) (in claim fighting closure of historically Black schools, "stigmatic injury results when discriminatory conduct by the state 'stigmatizes a person' or 'casts a **badge of inferiority**' on a disfavored group." *Id.* (Emphasis added).

### 3. "Stigmatic Injury" under Title II Public Accommodations

Among other things, the Civil Rights Act of 1964, Title II Public Accommodations is meant to protect people from race and color discrimination

---

Plaintiff is deeply repulsed, disheartened, and intimidated by the governmental celebrations of White supremacy against him as a Black American.

[Dec. Act., p.8]. *Laufer*, 29 F4th 1268 ("An individual who suffers an intangible injury from discrimination can establish standing if he personally experienced the discrimination.") *Id., citing Allen*, 468 U.S. at 757, n.22.

Polar opposite were the original plaintiffs in *Ladies Memorial Association v. City of Pensacola*, No. 20-14003, 2022 WL 1536750 (11th Cir. May 16, 2022). All the original plaintiffs in *Ladies Memorial* were either organizations or people sympathetic to the Confederacy and Confederate tributes. *Id.*, at pp. 6-7. There plaintiffs initially sought and received a temporary restraining order in Florida circuit court, but on removal to the Northern District of Florida, the district court addressed the plaintiffs' First Amendment claims based upon the assertion that "removing the [Confederate monument's] speech is eliminating their constitutionally guaranteed freedom of expression and speech rights" and the claims that the City of Pensacola, Florida violated their Due Process and Equal Protection rights. *Id.* at 7. The district court dismissed the case with prejudice, finding no standing as to any of the federal claims. *Id.*, at 5.

On appeal, relying primarily on *Gardner v. Mutz*, 962 F.3d 1329, 1338 (11th Cir. 2020) and *Diamond v. Charles*, 476 U.S. 54, 106 S. Ct. 1697, 1706 (1986), this Court found the "problem with the plaintiffs' allegations is that they do not amount to an injury we recognize under Article III." *Ladies Memorial*, at p. 9. The Eleventh Circuit held so because "[m]ost of the plaintiffs' allegations of harm go *only* to the general disagreement with taking down the [Confederate monument] and the general notion that such action by the government would violate their constitutional rights, both of which fall short of the *concreteness standard* ..." *Id.* (emphasis added).

This Court also found plaintiffs' taxpayer, preservation and reputation claims inadequate in *Ladies Memorial*. As to taxpayer standing, unlike Appellant, plaintiffs never alleged that their taxes were being used for the removal of the Confederate Monument, i.e. in the illegal activity being alleged. *Id.*, at 10. On preservation and reputation, the Court held the allegations lacking "concreteness" as to how removal affects Florida's history or their reputations because "a mere recitation that the government is violating one's constitutional rights is not concrete enough to establish standing." *Id.*, pp.9-10.

*Ladies Memorial* is consistent with *Gardner*, where this Court maintained the original finding of no protectable interest or cognizable injury to plaintiffs "vindicating the cause of the Confederacy and protecting and preserving memorials." *Gardner*, at p. 2. *Ladies Memorial* and other cases brought by Confederate sympathizers stand in stark contrast to the matter at hand.

in public places. Roads, streets, drives, and parks are places of public accommodation, as defined by the Civil Rights Act of 1964, as they are places of exhibition or entertainment, supported by governmental action and/or their operations affect commerce pursuant to 42 U.S.C. Section 2000a (c).

Put simply, race discrimination in public places and accommodation "establishe[s] public "badges of inferiority" for the excluded group, marking them as of lower social status" *Baird,* 85 F.3d 450, 454-55 (9th Cir. 1996). The "primary purpose" of Title II's public accommodations was "to solve this problem, the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 250-53 (1964) (citing the "pleasure and convenience" that must be afforded to Black people in places of public accommodation). However, the mere presence of Confederate Symbols in public places does not automatically violate Title II. Instead, the violation occurs when such presence results in discriminatory treatment or perpetuates segregation (*i.e.* establishing second-class status), thus impeding Appellant's "full and equal enjoyment" of public accommodation as pled. *Id.*; [D63, pp.2-11].

Appellant alleges that encounters with Confederate symbols in public places serves as a constant reminder of not only a painful history of racial

25

subjugation, but the current governmental endorsement of White supremacy, combining to create intangible, but concrete, particularized stigmatic injury. *Id.*

Unlike *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1338 (11th Cir. 2019), which found an organizational plaintiff did not have standing for stigmatic injury because complaints were not personal allegations of discriminatory experiences, Appellant alleges personal experiences of the discrimination and its concrete and particularized injuries. *Id.*; [D63, pp.2-11].

Certainly being physically present in parks, on streets, and in counties publicly honoring Confederates and the Confederacy adds to intensity of the "stigmatic injury" for Appellant. But consider the hearing-impaired *Sierra* plaintiff also "suffered a concrete and particularized injury" when observing parts Hallandale Beach's website that were inaccessible to the hearing impaired from a computer. *Id.*, 996 F.3d at 1114.

Similarly, Appellant need not have alleged to have continually been subjected to the offending symbols, *i.e*, returning to the locales again and again. *See e.g., Freedom from Religion Found. Inc. v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476-9 (3d Cir. 2016) (Shwartz, J.) ("Nearly every court of appeals has held that standing in this context requires only direct and unwelcome personal contact with the alleged establishment of religion.").

While altering one's behavior to avoid something may demonstrate that the thing avoided is unwelcome, altered conduct is not a prerequisite for obtaining standing in this context. *See also Salazar v. Buono*, 559 U.S. 700 (2010) (noting lower courts had found standing despite there being no change in activities of plaintiff). It is enough that an exposure occurred. *Robinson v. City of Edmond*, 68 F.3d 1226 (10th Cir. 1995), *cert. denied*, 517 U.S. 1201 (1996); *see e.g. Murray v. City. of Austin*, 947 F.2d 147 (5th Cir. 1991), *rehearing denied*, 1991 U.S. App. LEXIS 29558 (5th Cir.), *cert. denied*, 505 U.S. 1219 (1992).

Stigmatic injury via discrimination self-perpetuates inferiority by emotionally stigmatizing a member of the disfavored group: "Discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' ... can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group." *Sierra* at 1113, *citing Heckler*, 465 U.S. at 739-40.

The Eleventh Circuit has broadly recognized stigmatic injury in other contexts. For example, in *Elston*, 997 F.2d 1394, 1407 (11th Cir. 1993), plaintiffs alleged that the school board violated a variety of federal laws in connection with the restructuring of the school system, including the closure of historically Black schools. This Court held that "stigmatic injury results when

27

discriminatory conduct by the state 'stigmatizes a person' or 'casts a **badge of inferiority'** on a disfavored group." *Id.* (emphasis added).

The Supreme Court has also acknowledged the significance of stigmatic harm. In *Romer v. Evans*, 517 U.S. 620 (1996), the Court held that a state constitutional amendment targeting the LGBTQ+ community violated the Equal Protection Clause because it inflicted stigmatic injury by conveying a message of harm, exclusion, and second-class status. *Id.* Harm, exclusion, and second-class status allegations are indeed present at bar. *Elston,* 997 F.2d at 1407 (11th Cir. 1993).

The impact of Confederate Symbols on Appellant constitutes a violation of rights protected under Title II. The cumulative effect of these symbols denies Appellant the full and equal enjoyment of public accommodations and perpetuates an environment of racial inequality that Appellant pernally experienced. *Id.*[9]

---

[9] Likewise, where a state or local law discriminates based upon race or color in any place, it is a violation of Section 202 of the Civil Rights Act of 1964, which provides that all "persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation … without discrimination … on the ground of race, color …" 42 U.S.C. Section 2000a(a). In controlling former Fifth Circuit, *Robertson v. Johnson*, 376 F.2d 43 (5th Cir. 1967), determined that even where a specific ordinance or law is not at issue, Section 202 was "sufficiently broad to cover" *local customs* of race discrimination. There, a White woman sued claiming her arrest in a Black night club was the result of the City of New Orleans' custom of discouraging White women from entering Black entertainment establishments. Here, similarly, Appellant attacks as illegal the local customs of monuments and naming tributes to the Confederacy, Confederates, Confederate sympathizers in public places and spaces. *Id.,* at 45, n. 5 (noting a definition of custom as a "practice of the people, which, by common adoption and acquiescence, and by a long and unvarying habit, has become compulsory, and has acquired the force of law.").

In view of the foregoing, the declaratory action establishes standing and states a cause of action under Title II, as public funding for naming tributes and/or monuments to the Confederacy and Confederates and presence thereby in public spaces and places impede Appellant's "full use and enjoyment" of public places that are required to be free of race discrimination; and Appellant has demonstrated concrete, particularized "stigmatic injury" therefrom satisfying Article-III standing and the pleading standard.

4. "Stigmatic Injury" Under Thirteenth Amendment Badges of Slavery

What is clear from the Amendment itself as well as the writing of the courts at the time is that the intention of the Thirteenth Amendment was not merely the ending of literal slavery, but also an ending to those elements that allowed American slavocracy to exist. Right away, the philosophy of racial supremacy was identified as one such element. Civil Rights Act of 1866.

In the same light, when the Thirteenth Amendment barred the badges of slavery, it barred anything that would lead to the hindrance of the constitutional right to be free of all elements of slavery based on the stigma of a person's race. *See Civil Rights Cases*, 109 U.S. 3 (1883); *Or. v. Mitchell*, 400 U.S. 112, 128-29 (1970); *see also Hodges v. U.S.,* 203 U.S. 1, 26-27 (1906) (Harlan, J., dissenting); *Elston*, 997 F.2d at 1407 (in claim fighting closure of historically Black schools, "stigmatic injury results when discriminatory conduct by the

state 'stigmatizes a person' or 'casts a **badge of inferiority**' on a disfavored group.") (emphasis added).

This includes the government endorsement of racial superiority. *United States v. Cannon*, 750 F.3d 492, 501 (5th Cir. 2014) (holding White supremacist symbols amounted to "badges of slavery" and "indicators, physical and otherwise, of African-Americans' slave or subordinate status," violating Thirteenth Amendment); *see also* Edward H. Kyle, *Symbolism and the Thirteenth Amendment: The Injury of Exposure to Governmentally Endorsed Symbols of Racial Exposure to Governmentally Endorsed Symbols of Racial Superiority,* 25 Mich. J. Race & L. 77 (2019).

The Thirteenth Amendment was initially intended to eradicate the institution of slavery from the American landscape *and* provide an equal status to all races.  "By its own unaided force and effect it abolished slavery, and established universal freedom." *Slaughter-House Cases*, 83 U.S. 36, 69, 71–72 (1873). This general applicability was again stated in *Hodges*, 203 U.S. at 16–17, and confirmed by the result of the peonage cases.

Even before the ratification of the Thirteenth Amendment, the metaphoric usage of "badges" of slavery or servitude had common usage in courts and Congress to refer to race discrimination which constituted a remnant of Black slavery. In *Dred Scott*, Chief Justice Taney, following the

common meaning of the metaphor, uses the "badges" metaphor to refer to racially discriminatory laws in states that had abolished slavery. Likewise, Justice Daniel uses "badge of disgrace," comparing American slavery to slavery in ancient Rome. *Dredd Scott v. Stanford*, 60 U.S. 393, 479 (1857). Chief Justice Taney argued that racially discriminatory laws "stigmatized" and "impressed ... deep and enduring marks of inferiority and degradation" upon Black Americans as a group. *Id.*, at 416 (Black Americans "were identified in the public mind with the race to which they belonged, and regarded as a part of the slave population rather than free.") *Id*, at 393, 411.

State laws were imposing badges of slavery not because they maintained or attempted to reimpose the slave system; rather they imposed badges of slavery because, in conjunction with the White community's social customs, they imposed a stigma upon African Americans as a group. *Id.*

Another metaphoric example of the "badge" usage at the time was the phrase "badge of fraud," which occasionally appears in antebellum cases to refer to sham transactions made to shield a debtors' assets from creditors. George Rutherglen, *The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment,* University of Virgina School of Law (2007). By the 1800s, "badge of slavery" was commonly used to refer to dark skin, but it also had other meanings. Some abolitionists referred, for example, to

physically grueling labor as a "badge of slavery." Jennifer Mason McAward, *Defining The Badges, supra* 14 U. Pa. J. Const. L. 561 (2011-2012), n. 3, at 576–78.

A more historically grounded understanding of the "badges" metaphor *visa vi* the Thirteenth Amendment is found in Justice Harlan's dissent in the *Civil Rights Cases*, 109 U.S. 3 (1883). According to Justice Harlan, "discrimination practised [sic] by corporations and individuals in the exercise of their public or quasi-public functions is a **badge of servitude**," and, as such, is a proper target of Thirteenth Amendment regulation. *Id.* Though employing the metaphor to opposite ends, Justice Harlan's usage of the metaphor follows Justice Taney's in that it supposes that public discrimination reinforced by custom may impose a badge of slavery.

Justice Harlan again uses "badge of servitude" to explain discrimination based upon race in *Plessy v. Ferguson*, 163 U.S. 537 (1896). There Justice Harlan renews his view that the "arbitrary separation of citizens on the basis of race while they are on a public highway is a badge of servitude." *Id.* (emphasis added). Of course, the *Plessy* majority infamously denies that segregation marks African Americans with "a badge of inferiority." *Id.*

Justice Harlan understood that because the dogma of Black inferiority was integral to maintaining slavery, the Thirteenth Amendment's guarantee of

"freedom necessarily involved immunity from, and protection against, all discrimination against them, because of their race, in respect of such civil rights as belong to freemen of other races." *Id*; Nicholas Serafin, *Redefining the Badges of Slavery*, 56 U. Rich. L. Rev. 1291, 1337 (2022).

The historical usage of the "badges" metaphor indicates a more expansive question than the district court asked in *dicta*: is there a claim of slavery or involuntary servitude? Rather the appropriate determination is whether Appellant states a "stigmatic injury," as described *infra,* when pled under the Thirteenth Amendment's "badges of slavery" prohibitions. The answer is in the affirmative.

When the Thirteenth Amendment barred the "badges of slavery," it also barred anything that would lead to the hindrance of the constitutional right to be free of all elements of slavery based on a person's race. *See Or*, 400 at 128-29 (1970); *see also Hodges*, 203 U.S. at 26-27 (Harlan, J., dissenting). For example, in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), the Supreme Court upheld 42 U.S.C. 1982 after concluding that Congress's determination that "the exclusion of Negroes from white communities" through restrictions on sales of property was among the "badges and incidents of slavery." *Jones*, 392 U.S. at 422, 441-442; *Elston*, 997 F.2d at 1407 ("stigmatic injury results when discriminatory conduct by the state 'stigmatizes a person' or 'casts a **badge of**

33

**inferiority**' on a disfavored group.") (Emphasis added); *Baird,* 85 F.3d at 454-55 (race discrimination in public places in any materialization "established public "badges of inferiority" for the excluded group, marking them as of lower social status").

The Thirteenth Amendment has always been held as self-executing, which means it does not require an act of Congress to be implemented; hence §1983 is a proper vehicle to enforce it against a state actor.[10] "This Amendment . . . is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances." *Slaughter-House Cases*, 83 U.S. at 71–72 (1873); *United States v. Stanley*, 109 U.S. 20 (1883) ("This amendment, as well as the Fourteenth, is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances."); *Memphis v. Greene*, 451 U.S. 100, 125 (1981).

Monuments and tributes to the Confederacy stand for the enslavement and oppression of Black Americans and promote the ideal that Black people are inferior to White people, *i.e.* White supremacy. Thusly they are "badges" of slavery in violation of the 13th Amendment. *Cannon*, 750 F.3d at 501 (5th Cir. 2014) (holding White supremacist symbols amounted to "badges of slavery,"

---

[10] Again in Rule 12(b)(6) dicta, the district court suggests that Congress would need to take some action for anything other than actual slavery or involuntary servitude to be adjudicable. [D80, p.46].

violating Thirteenth Amendment); *Confederate Monuments as Badges of Slavery*, Loyola University Chicago, School of Law, Tsesis, A, p. 19 (2020) ("Confederate statues fall in that category [badges of slavery under the 13th Amendment], whether or not they are war memorials."). [11]

Confederate tributes celebrated on government property impede Appellant's "personal autonomy because they place persons, in particular blacks, on notice that they are outsiders living freely only at the dominant group's behests. Those symbols laud the works of persons who sought to maintain a system of involuntary servitude, and therefore they are not heroes to the progeny of the slaves or others who strive for a fair society." *Thirteenth Amendment*, 21 Harv. C.R.-C.L. L. Rev. 689, 735-36 (1986) (among other things, arguing that Thirteenth Amendment proscribes racially motivated violence and such violence impedes freedom). *See also Cannon*, 750 F.3d at 501.

Based upon the foregoing, the Court should find Appellant sufficiently pled Article-III "stigmatic injury" standing and a claim under the Thirteenth Amendment that public Confederate tributes violate his right to be free of the badges of slavery. *Jones*, 392 U.S. at 422, 441-442; *Elston*, 997 F.2d at 1407.

---

[11] "As long as Confederate symbols cast a tolerant aura on the Old South's racist past, some badges and incidents of servitude will remain ... Confederate symbols impede personal autonomy because they place persons, in particular blacks, on notice that they are outsiders living freely only at the dominant group's behests. Those symbols laud the works of persons who sought to maintain a system of involuntary servitude, and therefore they are not heroes to the progeny of the slaves or others who strive for a fair society." Tsesis, <u>Confederate Monuments as Badges of Slavery</u>, Kentucky Law Journal, Vol. 108, No. 4, 2020.

5. "Stigmatic Injury" Under Fourteenth Amendment Equal Protection

The Fourteenth Amendment commands Appellees to provide the members of all races with equal access to the public facilities it owns or manages, and the right of a citizen to use those facilities without discrimination on the basis of race is a basic corollary of this command. *Brewer v. Hoxie School District No. 46, etc*., 238 F.2d 91 (8th Cir. 1956). "No state shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, section 1. "The Equal Protection Clause speaks to the State or to those acting under the color of its authority." *United States v. Guest*, 383 U.S. 745 (1965). The involvement of the State need not be either exclusive or even direct to create rights under the Equal Protection Clause leading to the constitutional violation. *See, e.g., Shelley v. Kraemer*, 334 U.S. 1 (1948); *Commonwealth of Pennsylvania v. Board of Directors of City Trusts of City of Philadelphia*, 353 U.S. 230 (1957).

As argued *infra*, Appellant alleges that encounters with Confederate symbols in public places serves as a constant reminder of not only a painful history of racial subjugation, but the current governmental endorsement of White supremacy, combining to create intangible, but concrete, particularized "stigmatic injury" under the Fourteenth Amendment Equal Protection claim – satisfying Article-III standing and the pleading standard.

### b.    The District Court Erred in Not Finding Taxpayer Standing

Although taxpayer standing was not needed for the civil rights claims, the district court nonetheless erred when it found Appellant had no taxpayer standing. [D80, p.34]. The district court's ruling indeed countervailed its earlier determination in another Confederate tribute case – where it found taxpayer standing for Confederate sympathizers just months prior. *See Egerton v. City of St. Augustine*, No. 3:20-cv-941-BJD-PDB, D67, decided March 20, 2023. In *Eagerton*, plaintiffs sought to challenge the city's removal and relocation of a Confederate monument from a park. There, as at bar, a plaintiff claimed to be a resident taxpayer, who alleged that expenditures in relation to a Confederate monument were illegal. The district court however found taxpayer standing for the Confederate sympathizers in *Eagerton* and rejected the same standing for Appellant.

Taxpayer standing is long-lived. *Crampton v. Zabriskie*, 101 U.S. 601 (1789) (there is "no serious question" regarding "the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county ..."); *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1280 (11th Cir. 2008). In *Pelphrey* this Court stated: "[t]he standing of municipal taxpayers to challenge, as unconstitutional, expenditures by local governments remains settled law." *Id.*, at 1280.

While the district court held the declaratory action failed to allege how public funding was being expended unlawfully, the record suggests otherwise. Appellant claimed to be a local resident taxpayer and that "[t]he Mayor continues to maintain public funding for tributes to the Confederacy, Confederates and White supremacists on public land in Duval County, including monuments, tributes, streets, roads, and parks ... general budgetary allocations inuring to the presence, maintenance, preservation and protection of monuments and/or naming tributes to the Confederacy, Confederates and White supremacists on public land, within the Middle District of Florida, through public tax-based funding, under the color of law." [D63, paras. 18, 20]. Appellant further alleges that such tax funding allocations violate Title II, the Thirteenth Amendment, and the Fourteenth Amendment. [D63].

In view of the foregoing, Appellant has sufficiently pled taxpayer standing.

## C.    Conclusion

Based upon the foregoing, this Court should reverse the judgment of dismissal, finding Article-III "stigmatic injury" standing and taxpayer standing, and remand the case for further proceedings.

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of December 2023, I electronically filed the Plaintiff-Appellant's Opening Brief with the Clerk of the Court, serving counsel for the Appellees.

By: */s/ Earl M. Johnson Jr.*
Earl M. Johnson, Jr.
*Pro Se* Appellant
1635 North Liberty Street
No. 3
Jacksonville, FL  32206
(904) 525-2479 Telephone
earlmayberryjohnson@gmail.com

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 10,689 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Plain.

Dated: December 12, 2023        By:    */s/ Earl M. Johnson Jr.*
Earl M. Johnson, Jr.
*Pro Se*
1635 North Liberty Street, No. 3
Jacksonville, FL  32206
(904) 525-2479 Telephone
earlmayberryjohnson@gamil.com